# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs April 17, 2013

## STATE OF TENNESSEE v. COREY D. GILBERT

### Appeal from the Circuit Court for Montgomery County
### No. 40901308    Michael Jones, Judge

_____

### No. M2012-01231-CCA-R3-CD - Filed June 11, 2013

_____

A Montgomery County jury convicted the Defendant, Corey D. Gilbert, of first degree felony murder and attempted aggravated robbery. The trial court imposed a mandatory life sentence for the felony murder conviction and a three-year sentence for the attempted aggravated robbery conviction. On appeal, the Defendant challenges the evidence supporting his conviction for attempted aggravated robbery as the underlying offense for the felony murder conviction. After a thorough review of the record and applicable law, we affirm the trial court's judgments.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, Corey D. Gilbert.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; John W. Carney, District Attorney General; Steve Garrett, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the attempted robbery and shooting death of the victim, George Labront Miller, which occurred on July 21, 2009. For these crimes a Montgomery County grand jury indicted the Defendant for first degree felony murder and aggravated robbery.

At a trial on these charges, the State presented the following evidence: George Miller,

the victim's father, testified that his son was twenty-one years old at the time of his death. Miller recalled that he last saw his son alive at a family reunion on July 4, 2009. The next time he saw his son was at the funeral home. Miller identified a photograph of his deceased son.

Brittaney Welch testified that in July 2009 she lived in a room at the A & W Motel. The victim also resided at the A & W Motel in a room near Welch's room. Welch recalled that, on the night of July 21, 2009, she observed a black woman get out of a black Impala with tinted windows and go up to the victim's room with him. Another black woman drove the Impala away. Later in the evening she heard what sounded like a fight coming from the victim's room. At around 11:00 p.m., Welch observed the Defendant and Dominick Hodges, a co-defendant, run past her room and to an empty parking lot behind the motel where they got into the same black Impala she had earlier seen. The black Impala sped away at a "high rate of speed." Welch testified that the next morning she saw "a whole lot of police" taking the door off of the victim's room.

On cross-examination, Welch testified that she had previously seen the victim sell drugs to another resident of the hotel. Welch testified that she was fifteen years old at the time of these crimes. Welch identified her statement to police and agreed that she did not mention the sounds of a fight emanating from the victim's room or the Defendant's flight past her room later that night. She explained that she did not tell police these facts because, at the time, she did not know what was relevant to the case.

Shawntay Evans testified that she, Cassandra Santos, the Defendant, and Dominick Hodges made a plan to rob the victim. Evans said that, at first, there were text messages exchanged regarding "setting [the victim] up with [Hodges]." On the night of July 21, 2009, Santos was at Evans's house, and the Defendant and Hodges drove to Evans' house in the Defendant's black Impala. A plan was devised for Evans to gain entry into the victim's motel room, and then she was to notify the others when to come to the room to rob the victim. She explained that she was selected to enter the room first because the victim had a romantic interest in her. Evans could not recall the victim's room number but said that the motel where he stayed was the A & W Motel.

Evans testified that, earlier in the evening, the victim's ex-girlfriend, Candace Ligon, had been at Evans' home and told Evans that the victim did not carry a gun. The victim relayed this information to the others, and the group agreed that the Defendant and Hodges would not use a gun during the robbery but would just hit the victim to scare him into giving up his money. Evans said that they planned to rob the victim of "[m]oney, dope, whatever we found." Even though they knew the victim was unarmed, both the Defendant and Hodges carried guns. Evans recalled that Hodges did not "like his gun" because "it was small," so

2

the Defendant drove them to "Lincoln Homes" to find a different gun for Hodges. When Hodges was unable to find a replacement gun, the group proceeded to a Kroger where the Defendant, "T.K.," and Hodges got out of the car, and Santos drove Evans to the motel.

Evans testified that she met the victim at the motel, and the two went upstairs to his room. Santos waited until Evans entered the room and then drove back to the Kroger to pick up the Defendant and Hodges. Inside the victim's room, Evans and the victim "chilled," "talked," and "smoked blunts." While in the room, Evans communicated with Santos by texting the Defendant's phone. Evans said that she tried to get the door unlocked, so the Defendant and Hodges could get inside, but when she could not do so, she walked outside to the parking lot. In the parking lot, she saw the Defendant and Hodges on the side of the building, and Hodges motioned for Evans to go back to the victim's room.

Evans testified that she returned to the room leaving the door open this time and told the victim that she was waiting for her cousin. Evans and the victim were seated on the bed when the Defendant and Hodges came into the room with their guns drawn and began "pistol-whipp[ing]" the victim. Evans said that, as she ran out of the room while the Defendant and Hodges were hitting the victim, the victim was covering his face and trying to get up off of the bed. Evans recalled that, after the Defendant and Hodges came out of the victim's room, but before they got into the Impala, Hodges threw the guns into the bushes at the back of the Cumberland Grille restaurant where the car was parked. Evans recalled that she and Santos were in the back seat of the Impala, the Defendant was in the passenger seat, and Hodges drove the car away from the motel.

Evans testified that Hodges drove to a wooded area and parked the car. Evans, the Defendant, Santos, and Hodges then went into the woods to hide. Evans said that they did this in an attempt to conceal themselves because they did not know if anyone had seen the black Impala. While in the woods, Hodges said that he thought he had accidentally shot the victim. Evans said that she responded saying "no" and "that's not true," and the Defendant said, "[W]ell, y'all didn't see the way the blood hit against the wall."

Evans testified that she initially lied to police because she was scared and did not want anyone to get in trouble. One of Evans' family members, however, encouraged Evans to tell the truth and Evans' mother "made [her] go to the detective." Evans then told the police the same version of events that she told the jury. Evans said that she was seventeen years old at the time of these crimes, and she was charged with first-degree murder in Juvenile Court. Evans said that she pled guilty to conspiracy to commit aggravated robbery in Juvenile Court and served one month in a detention facility. Evans said that she and Santos accepted the same plea offer. Evans said that the only item taken from the victim that night was marijuana.

3

On cross-examination, Evans agreed that, while she was in the victim's room, the victim left several times to sell drugs to various people. Evans denied that she and Hodges devised the plan to rob the victim and stated that the Defendant told her that, initially, he and Hodges planned to rob the victim on their own.

On redirect examination, Evans testified that, when the Defendant and Hodges entered the room, the Defendant wore a white bandana and Hodges wore a red bandana to cover their faces.

Dr. John Davis, an Assistant Medical Examiner, testified that he conducted the autopsy on the victim's body. Dr. Davis determined that the cause of death was a gunshot wound to the head, and the manner of death was homicide. Dr. Davis said that the wound was a contact range gunshot wound indicating that the muzzle of the gun was less than two inches from the victim's head when the gun was fired. Dr. Davis also observed two lacerations on the victim's head that were caused by a blunt object. On cross-examination, Dr. Davis testified that the toxicology report indicated that the victim had THC, a metabolite of marijuana, in his system at the time of death.

Gary Hodge, a Clarksville Police Department detective, testified that he reported to the A & W Motel during the afternoon of July 22, 2009. Detective Hodge said that he sketched a diagram of the crime scene, photographed the scene, and documented evidence. Detective Hodge identified diagrams of the crime scene that he had created: a diagram of the back of the A & W Motel, and another of the victim's room. Detective Hodge testified that there was blood on every wall in the living area of the room. He identified a photograph of a bullet round and another photograph of a shell casing that were also found in the room.

Detective Hodge testified that he processed the black Impala for evidence. Detective Hodge identified photographs of the car and said that a red bandana was recovered from the glove compartment in the car. Detective Hodge confirmed that the car was processed for blood and fingerprints.

On cross-examination, Detective Hodge identified drug paraphernalia recovered from the victim's room.

Frederick McClintock, a Clarksville Police Department officer, testified that he assisted in the investigation of the shooting of the victim. Officer McClintock said that he collected a black ammunition magazine containing seven .45 caliber rounds. The magazine was found on the floor near the bed. Officer McClintock also found a .45 caliber shell casing and an intact bullet in the room.

4

Joey Scruggs, a Clarksville Police Department officer, testified that on July 23, 2009, he reported to the Cumberland Grille, a restaurant located next to the A & W Motel. Officer Scruggs said that he was asked to perform an article search with his police dog. Specifically, police were searching for a gun in a wooded area behind the parking lot of the Cumberland Grille. Officer Scruggs said that he recovered two guns, a .45 semi-automatic handgun and a .22 handgun, from the very back of the Cumberland Grille parking lot. Officer Scruggs said he found the guns lying on a mound of dirt among tall weeds. He described the position of the guns saying that the two guns were "pretty much laying [sic] on top of each other."

Steve Scott, a Tennessee Bureau of Investigation ("TBI") special agent, testified that he examined the guns recovered behind the Cumberland Grille. One of the guns was a .45 caliber semi-automatic pistol. The magazine could be loaded with nine cartridges, and the chamber could hold one cartridge for a total capacity of ten cartridges. Upon receipt, the magazine contained seven cartridges. Agent Scott said that the .45 caliber pistol was in good working condition. He test-fired the gun with a cartridge from the magazine and compared the test shell casing with the shell casing ("evidence shell casing") recovered by police. Based on the comparison, Agent Scott determined that the shell casing recovered from the crime scene was fired from the .45 caliber semi-automatic pistol recovered behind the Cumberland Grille.

Agent Scott testified next about the .22 caliber revolver that was also found behind the Cumberland Grille. Agent Scott said that the gun was in good working condition, and he conducted a test-fire with the gun and retrieved the test shell casing to compare with the evidence shell casing. Agent Scott was unable to conclude that the .22 fired any of the evidence shell casings.

Jennifer Sullivan, a TBI forensic scientist, testified that she tested a rock-like substance, recovered from the victim's room at the A & W Motel and confirmed that substance tested positive as cocaine base. She testified that, before testing, the substance weighed 2.2 grams.

Will Evans, a Clarksville Police Department officer, testified that, on July 24, 2009, he helped conduct a consensual search of the Defendant's apartment. During the search, police found one spent shell casing, "several" unspent shell casings, a white bandana, and a cellular phone. Officer Evans recalled that the white bandana recovered was found stuffed in a macaroni and cheese box in the kitchen trash can. He said that he observed what appeared to be small brown spots on the bandana.

Bradley Everett, a TBI special agent, testified that he conducted DNA analysis of the substance found on the white bandana recovered from the Defendant's apartment. Agent

Everett said that presumptive tests indicated the presence of blood on the bandana and on the .45 caliber handgun that was recovered near the Cumberland Grille, and the test indicated the presence of blood.

Agent Everett testified that he then took a swab from the barrel of the .45 caliber handgun for further testing and the DNA profile from the swab matched the victim. Agent Everett also conducted further testing on the blood on the white bandana. The DNA profile obtained from the blood was a mixture of at least three individuals. The major contributor profile matched the victim. The minor contributor DNA profile was from two or more individuals, and the Defendant and Hodges could not be excluded as minor contributors.

Agent Everett testified that, several months later, he conducted further testing on the bandana hoping to obtain a DNA profile from any skin cells that might have been left on the bandana. Agent Everett swabbed three areas of the white bandana and found that Hodges was the major contributor of the DNA profile for the first swab. The second swab contained a mixture of at least three individuals, from which Hodges and the Defendant could not be excluded as possible contributors. The third swab was also a mixture of at least three individuals. The Defendant and Hodges could not be excluded as possible contributors to the profile.

Suzann Lafferty, a TBI forensic scientist, testified that she compared the known prints of the Defendant, Hodges, and the victim with the latent prints taken from various pieces of evidence gathered during the course of the investigation. Agent Lafferty made eleven identifications with the Defendant for latent prints taken from his Chevy Impala. All other latent prints taken from other sites were either unidentifiable or Agent Lafferty was unable to match the latent print with one of the known prints.

The State re-called Dr. Davis. Dr. Davis testified that the victim's gunshot wound would not be immediately fatal, and the victim would have still been capable of movement after sustaining the wound. He explained that the face, scalp and brain are "highly vascular" meaning that injury to these areas will cause a lot of bleeding. Dr. Davis opined that the pictures of the victim and blood trail are consistent with the possibility that the victim was able to move off the right side of the bed and around the wall to the entrance of the room.

On recross examination, Dr. Davis testified that he removed five-twenty dollar bills, one-ten dollar bill and a metal ring from the victim's person.

Alan Charvis, a Clarksville Police Department detective, testified that the Defendant was brought into the Major Crimes office as a suspect in this homicide. After Detective Finley issued *Miranda* warnings, the Defendant spoke with police initially, denying any

6

knowledge of the homicide at the A & W Motel. Detective Charvis confronted the Defendant with information developed during the investigation, and the Defendant admitted to being at the A & W Motel during the robbery. The Defendant told police that, while Evans was in the room with the victim, she texted him when to enter the room. The Defendant said that he and Hodges entered the room and Hodges began a fist fight with the victim. The Defendant admitted to ownership of the .22 handgun but denied carrying the gun into the victim's room. Detective Charvis said the Defendant told detectives that "he knew the robbery was going to happen and he was going along with it." The Defendant refused to allow police to record his statement.

Timothy Finley, a Clarksville Police Department detective, testified that he was the lead detective for this case. During his interview with the Defendant, Detective Finley found the Defendant's responses to questions appropriate. Detective Finley explained that the Defendant wrote his own statement. Detective Finley read the statement as follows:

> Particularly, we had a plan to rob somebody. I usually, when I hear something like that, I pay it no mind, but I snort cocaine occasionally, and I wasn't in my right state of mind when I agreed to be involved. Usually, I would think about my kids, but something about the drug I like, changed me. We went out to the hotel and waited for a while, trying to think of a plan. Initially, it was supposed to be simple. We were just supposed to wait until the girl gave us the go. When she did give us the go ahead, we went into the hotel room and I was just in the background watching. I couldn't tell what was happening. I just remember that it was kind of - - a lot of noise and then a gunshot. After the gunshot, I didn't know if somebody had got shot or what? I really didn't even get inside the hotel room. Maybe a step, if that? It all happened so fast. I got scared of the gunshot and ran to the car with everybody else. Then I went home. I didn't kill anybody. I don't know even if he was dead when we left, I just know I didn't do it. I am not sure, but I think [Hodges] hid the gun, the .22 was mine but I didn't even go in the room, and I really didn't want anybody to get hurt. I was just . . . f'd up on [cocaine] and didn't care.

Detective Finley then read a series of questions police provided and the Defendant's handwritten answers. In these responses, the Defendant identified Evans, Santos, Hodges and himself as the persons involved in the plan to rob the victim. He said that Evans ran out of the room when he and Hodges entered. When asked if he went to the room to help Hodges rob the victim, the Defendant replied, "Really, I just went as support, just to make sure nothing went wrong. I wasn't willing to put a gun to him and beat him. I just wanted to make sure whatever was taken was shared because I drove."

Based upon this evidence, the jury convicted the Defendant of first degree felony murder and attempted aggravated robbery. The trial court imposed the mandatory minimum life sentence for the first degree felony murder conviction and a three-year sentence for the attempted aggravated robbery conviction. It is from this judgment that the Defendant now appeals.

## II. Analysis

The Defendant contends that because the record does not support a conviction for the underlying offense, attempted aggravated robbery, the evidence is insufficient to sustain his felony murder conviction. The State responds that the proof supports the jury's finding of the Defendant's guilt of felony murder and attempted aggravated robbery beyond a reasonable doubt. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "'A

guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)).  The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)).  This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)).  Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

## A. Attempted Aggravated Robbery

A conviction for attempted aggravated robbery consists of an attempt to commit the "intentional or knowing theft of property from the person of another by violence or putting the person in fear" and is "accomplished with a deadly weapon" or causes the victim "serious bodily injury." T.C.A. § 39-13-401 and -402 (2006).  Under a theory of criminal responsibility, "[p]resence and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which one's participation in the crime may be inferred." *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998).  No particular act need be shown, and the defendant need not have played a physical role in the crime in order to be held criminally responsible for the crime. *State v. Caldwell*, 80 S.W.3d 31, 38 (Tenn. Crim. App. 2002).  Rather, to be held criminally responsible for the acts of another, the defendant need only "associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree." *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994); *see also State v. Steven Nelorn Hampton, Jr.*, No. M2004-00704-CCA-R3-CD, 2005 WL 677279, at *5 (Tenn. Crim. App., at Nashville, Mar. 24, 2005) (finding sufficient evidence to convict the defendant of especially aggravated robbery under a criminal responsibility theory because he admitted that he shared in the proceeds of the robbery, was present at the scene of the

crime, and was with his co-defendants both before and after the commission of the crime), *perm. app. denied* (Tenn. Oct. 10, 2005).

The evidence, viewed in the light most favorable to the State, proves that the Defendant planned and attempted to execute the robbery of the victim. The Defendant, Hodges, Santos, and Evans met with the purpose of planning a robbery of the victim. The four used the Defendant's vehicle to drive to the A & W Motel and flee the scene following the attempted robbery. After devising a plan, Santos and Evans dropped the Defendant and Hodges off at a nearby Kroger to wait while Evans gained entry to the victim's room. The Defendant's cellular phone was used to communicate with Evans while she was in the victim's room. The Defendant and Hodges entered the victim's room with guns and "pistol-whipped" the victim and ultimately shot and killed the victim. This is sufficient evidence upon which a jury could find beyond a reasonable doubt that the Defendant attempted to rob the victim with a gun and as a result, the victim was killed.

The Defendant specifically argues that he withdrew from the robbery prior to the victim's death. In his brief, he asserts that he was "a mere support player in the Miller incident," and did not actively participate in the robbery. We disagree with this characterization of the Defendant's role in the robbery. The Defendant provided transportation to and from the victim's place of residence. The Defendant told police that he went into the victim's room to make sure the proceeds of the robbery were shared, noting his entitlement to some of the proceeds on the basis that he provided his vehicle in execution of the robbery. The Defendant entered the victim's room armed and with the intent for the victim to be robbed, whether at the hands of Hodges alone or both of the men together. The evidence, viewed in a light most favorable to the State, proves beyond a reasonable doubt that the Defendant associated himself with the venture, knew the robbery was going to take place, and shared in the intent to rob the victim. Furthermore, the Defendant acknowledged after the robbery seeing the way the "blood hit against the wall," indicating he was a participant in the robbery attempt even after the victim had been shot. The Defendant got into the car with Hodges and fled with him, hiding in the woods after the robbery attempt. There is no proof that the Defendant withdrew from the attempted robbery. Accordingly, the Defendant is not entitled to relief as to this issue.

### B. Felony Murder

Felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, or aircraft piracy." T.C.A. § 39-13-202(a)(2) (2010). In this case, the Defendant was convicted of first degree felony murder in the perpetration of an attempted aggravated robbery. The mental state required for

the conviction was that the Defendant possessed the intent to commit the underlying offense, which in this case was the attempt to commit aggravated robbery. Aggravated Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear," and is "accomplished with a deadly weapon" or causes the victim "serious bodily injury." *Id*. § 39-13-202(b); § 39-13-401 and -402.

The evidence, viewed in the light most favorable to the State, proves that the Defendant planned and attempted to execute the robbery of the victim. The Defendant and Hodges, while armed, entered the victim's room to rob the victim. During the course of the attempted robbery, the victim was shot and killed. As we previously concluded, the Defendant possessed the intent to commit the underlying offense, the aggravated robbery, and the victim was killed during the perpetration of the attempted aggravated robbery. Accordingly, we conclude the evidence is sufficient to support the jury's finding that the Defendant was guilty beyond a reasonable doubt of first degree murder in the perpetration of an attempted aggravated robbery. As such, the Defendant is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record before this Court, we hold that the evidence is sufficient to sustain the Defendant's convictions. Therefore, the trial court's judgments are affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE